IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SANDRA M. McWHORTER,

      Plaintiff,

      v.                                      Case No.  4:11cv333-CAS

MICHAEL J. ASTRUE,
Commissioner of Social Security
Administration,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER

      This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and referral by United States District

Judge Robert L. Hinkle.  Docs. 6 and 7.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).

The Commissioner has filed a transcript of the underlying administrative proceeding and

evidentiary record (hereinafter referred to as "R." followed by the appropriate page

number).  After careful consideration of the entire record, the undersigned finds

substantial evidence supports the decision of the Administrative Law Judge (ALJ).

Therefore, the Decision of the Commissioner is affirmed.

## I.  Procedural History

On September 12, 2006, Plaintiff Sandra M. McWhorter filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning November 15, 2001, due to vulva cancer, cyst, and neuropathy.  R. 17, 69, 131-35, 156.  Plaintiff's application was denied initially on September 27, 2006, and upon reconsideration on March 7, 2007.  R. 69-75.

On April 23, 2007, Plaintiff filed a request for hearing.  On February 10, 2009, Plaintiff appeared and testified at a hearing conducted by ALJ Stephen C. Calvarese. R. 23-66.  Robert N. Strader, an impartial vocational expert, testified during the hearing. R. 63-64.  Plaintiff was represented by David Sullivan, an attorney.  R. 17, 23.

On April 6, 2009, the ALJ issued a Decision denying Plaintiff's application for benefits.  R. 17-22.  Plaintiff filed a request for review and submitted a memorandum in support.  On June 23, 2011, the Appeals Council denied Plaintiff's request for review. *Id.* at 1-6.  This appeal followed, in which Plaintiff is proceeding pro se.  *Id.* at 11-13. The parties filed memoranda of law, Docs. 14 and 17, which have been considered along with the record.

## II.  The ALJ's Decision

In the written Decision, the ALJ indicated the issue in this case is whether Plaintiff is disabled under sections 216(I) and 223(d) of the Social Security Act.  R. 17. The ALJ explained that "disability" is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that

has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* After considering all the evidence, the ALJ concluded Plaintiff "was not under a disability within the meaning of the Social Security Act from November 15, 2001 through the date last insured." *Id.*

In particular, the ALJ set forth the five-step sequential evaluation used for determining whether an individual is disabled under the Social Security Act: whether the plaintiff (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the applicable regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy.  R. 19.  *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also, e.g.*, Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  The ALJ found that, as to the first step, the Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured.     R. 19.  At the second step, concerning whether the Plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that is "severe," the ALJ found that "[t]hrough the date last insured, the [Plaintiff] had the following medically determinable impairment: cancer of the vulva, and status post excision of cancerous tissue of the vulva."  R. 18-19.  The ALJ further found that "[t]hrough the date last insured, the [Plaintiff] did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for twelve consecutive months; therefore, the [Plaintiff] did not have a severe impairment or combination of impairments."  R. 19.  Because Plaintiff did not have a severe impairment or

combination of impairments, the ALJ concluded Plaintiff was not under a disability, as defined in the Social Security Act, at any time from November 15, 2011, through the date last insured.  R. 22.

### III.  Issues Presented

In her pro se appeal, Plaintiff asserts the evidence does not support the decision of the Social Security Administration (SSA).  Docs. 1 and 14.  In particular, Plaintiff raises three arguments: (1) the Social Security Administration failed to provide the correct date last insured, December 31, 2002; (2) the ALJ failed to give appropriate weight to the opinion of the treating physician, Dr. Robert Ashmore; and (3) the ALJ erred in finding Plaintiff's allegations of disability not credible.  Doc. 14 at 1.

In response, Defendant asserts that substantial record evidence supports the ALJ's decision.  Doc. 17 at 2.  Regarding Plaintiff's first argument, Defendant indicates the ALJ used an incorrect date last insured in the order – December 31, 2002 – because all parties consistently indicated in the documentation and at the hearing that the correct date was December 31, 2001; thus, the ALJ's use of December 31, 2002, in the order was "a decision-writing error."  *Id.* at 8.  As to Plaintiff's second argument, Defendant asserts the ALJ properly rejected Dr. Ashmore's opinion, finding it unsupported by his treatment notes.  *Id.* at 13.  Finally, as to Plaintiff's third argument, Defendant asserts the ALJ properly found Plaintiff's statements about her impairments and limitations not entirely credible.  *Id.* at 11-12.

## IV.  Standard of Review

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). This court may not "decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]."  Bloodsworth, 703 F.2d at 1239.  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips, 357 F.3d at 1240 n.8 (citations omitted).

"A 'substantial evidence' standard, however, does not permit a court to uphold the [Commissioner]'s decision by referring only to those parts of the record which support the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Id.  "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a

whole to determine whether the conclusions reached are rational.'" Cowart v.

Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

## V.  Legal Analysis

### A.  The Last Date Insured

Plaintiff first argues the Social Security Administration failed to provide a correct

date last insured.  Doc. 14 at 1, 3-4.  Plaintiff asserts that an incorrect date, December

31, 2011, was used by all concerned, from the initial claim through the hearing;

however, "[t]he date was corrected, at some time, by someone, and (only) correctly

stated in the ALJ decision letter as being 'December 31, 2002.'"  *Id.* at 3.  Plaintiff

asserts, "No one, including the ALJ, ever explained how/why/when this change was

made."  *Id.*  Plaintiff argues the error was exacerbated because relevant evidence was

excluded based on the incorrect date of December 31, 2001.  *Id.*

Although Plaintiff correctly points out the ALJ used December 31, 2002, as the

date of last insured in his decision, that date appears incorrect.  Indeed, as Plaintiff also

correctly points out, all parties used and cited December 31, 2001, as the date of last

insured, from the initial claim through the hearing.  *See* R. 69-72, 144-49.  Plaintiff's

attorney references December 31, 2001, as the date of last insured in prepared

documents and at the hearing.  *See* R. 26, 97.  Nothing indicates that date is incorrect.

Therefore, the ALJ's use of December 31, 2002, rather than December 31, 2001, in his

decision appears to be a scrivener's error.  Further, any error is harmless because the

ALJ evidently used a larger time period yet still found no severe impairment.  As

explained below, substantial record evidence supports the ALJ's determination of no severe impairment.

### B.  Treating Physician's Opinion

Plaintiff next argues the ALJ failed to give appropriate weight to the opinion of her treating physician, Dr. Robert Ashmore.  Doc. 14 at 1, 5-6.  Plaintiff argues          Dr. Ashmore's opinion is the only medical opinion in the record and, therefore, there is no contradictory medical evidence from other sources.  *Id.* at 5.  Plaintiff argues that based on the SSA's guidelines, in 20 C.F.R. § 404.1527, Dr. Ashmore's opinion should be given controlling weight.  *Id.*

The ALJ made the following findings regarding the medical evidence in this case:

On November 30, 2001, in response to the claimant's complaints of discomfort of the vulva, a specimen from the affected site was removed for biopsy.  The biopsy was performed by Dr. Benjamin Turner, and the results indicated that there were no signs of malignancy (Exhibit 13F).  In December of 2001, Dr. Robert Ashmore excised the neoplastic lesion, utilizing laser vaporization, without complication.  It was noted there was zero blood loss during the procedure.  The excised tissue was tested by Dr. Woodward Burget, who indicated that he did not recognize any definitive malignant invasion (Exhibit 14F).

In December of 2006, the claimant reported to a consultative psychological examination conducted by Dr. Mary Price.  Dr. Price noted that the claimant was confused as to the reason for the examination, as she did not believe she had a mental impairment, and was unaware of alleging a mental impairment in her disability claim.  After interviewing the claimant Dr. Price opined that the claimant may have experienced a depressive episode in the past, but did not find evidence of an ongoing determinable mental impairment (Exhibit 4F).

In February of 2007, Dr. Ashmore prepared an evaluation of the claimant's residual functional capacity.  Utilizing a checklist form and choosing from prepared answers, Dr. Ashmore indicated that the claimant could only

stand for one hour per day and could not sit at all.  He also indicated that she could not lift any amount of weight, though he indicated that she could perform simple grasping, pushing, and fine manipulation.  He indicated that she could not use her feet for repetitive movements, such as operating foot controls and that she was not able to squat, crawl, or climb. He indicated that he did not believe that the claimant could sustain activity at a pace and with the attention to task as would be required in a competitive work place and that she could not be expected to attend to any employment on an eight hour a day, five day a week basis.  He attributed this to chronic pain of the vulva and edema during the relevant time period to be considered, without further explanation (Exhibit 15F). However, a review of the medical records kept during this time period fail to document symptoms or affects that would support Dr. Ashmore's statements in this document.

The remaining medical evidence submitted to the record only covers the claimant's condition from October of 2006 to October of 2008, well past the claimant's date last insured.

. . . .

As for the opinion evidence, though Dr. Ashmore has apparently maintained a treating relationship with the claimant his opinion of the claimant's functioning in 2001 as stated in Exhibit 15F cannot be accepted.  This is because the level of limitation he ascribes to the claimant is in no way supported by the medical records he kept at that time.  The undersigned notes that Dr. Ashmore answered this questionnaire, regarding the claimant's functioning in December of 2001 in February of 2007, and only vaguely supported his selections.

R. 20-22 (emphasis added).  The ALJ determined:

In sum, the conclusion that the claimant did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities is supported by the near total lack on any record of medical care in 2001 and 2002, following her surgery.  As there is no credible objective evidence of any sustained limitation, resulting from the claimant's cancer of the vulva or excision, the claimant's impairment must be found to be non-severe.

R. 22 (emphasis added).  It is not clear what the ALJ meant by this last emphasized

portion.  As explained in detail below, the record indicates Plaintiff returned to          Dr.

Ashmore with some frequency following her December 2001 surgery, with less

frequency in 2003, twice in 2004, and then with increasing frequency in 2005.  The

doctor's notes and medical records from these visits do not reflect any restrictions or

limitations on Plaintiff's activities, however.

### 1.  Dr. Ashmore's Notes and Medical Records

Specifically, the record reflects that Plaintiff first saw Dr. Ashmore on November

30, 2001.  R. 423.  The medical record of the visit indicates she complained of vaginal

discharge and Dr. Ashmore indicated findings of leukoplakia of the right labia and non-

specific vaginitis.  *Id.*  Plaintiff was taking only hormone replacement and cholesterol

medications.  *Id.*  A biopsy of the vulva indicated stage three vulvar intraepithelial

neoplasia (VIN III) with "[n]o invasive malignancy."  R. 424.  Plaintiff returned to

Dr. Ashmore on December 11, 2001, and her medications were unchanged.  R. 422.

On December 18, 2011, to treat Plaintiff's VIN III, Dr. Ashmore performed an excision

and laser vaporization.  R. 422, 428.  The surgical notes indicate the doctor observed "a

large lesion involving the distal two-thirds of the right vulva," which he excised "without

difficulty."  R. 428.  The site was cauterized and other areas were vaporized with a

laser.  *Id.*  Dr. Ashmore noted no evidence of bleeding or additional lesions.  *Id.*  The

surgical pathology report indicated "[w]idespread" VIN III with "focal dysplasia at

margins."  R. 429.  The pathologist noted "in situ carcinoma," but he found no "definitive

invasion."  *Id.*  Plaintiff was to return for follow up in three months.  *Id.*

Plaintiff returned to Dr. Ashmore for a post-operative check on January 2, 2002,

and she was worked in for an appointment on January 10, 2002.  R. 285.  It appears the

doctor prescribed Toradol, a pain medication.  *Id.*  Other notes indicate Plaintiff

complained of vulvar bleeding and swelling.  *Id.*

At a follow-up on January 16, 2002, Plaintiff complained of vulvar swelling after

walking.  R. 284.  Dr. Ashmore noted Plaintiff was healing well, but slowly, and

recommended she return in two weeks.  *Id.*

On January 30, 2002, Plaintiff returned for another post-operative check.

R. 283.  Nothing indicates she was taking pain medication.  *Id.*  Dr. Ashmore noted she

was "healing well."  *Id.*  He recommended she return in six months for a colposcopy.  *Id.*

On May 14, 2002, Plaintiff saw Dr. Ashmore and complained of vaginal pain,

vulvar irritation, odor, and discharge of one week's duration.  R. 282.  Her current

medications included Vioxx.  *Id.*  Dr. Ashmore prescribed an antifungal medication.  *Id.*

Plaintiff returned on May 22, 2002, again reporting vulvar irritation, and Dr. Ashmore

noted some improvement but prescribed another antifungal medication.  R. 281.

Plaintiff was still taking Vioxx.  *Id.*

On July 16, 2002, Dr. Ashmore performed a well-woman examination on Plaintiff,

including a colposcopy of the vulva.  R. 280.  Nothing indicates Plaintiff was taking pain

medication.  *Id.*

On December 12, 2002, Plaintiff presented for a recheck of VIN III.  R. 279.     Dr. Ashmore performed a colposcopy and instructed Plaintiff to return in one week.  *Id.* On December 16, 2002, Plaintiff called the doctor's office, complaining of bleeding and was advised that this was the result of a change in her hormone replacement medication.  R. 279.  Plaintiff also indicated she was having vaginal pain and was taking Advil.  *Id.*  Dr. Ashmore worked her in the next day, December 17, 2002, and Plaintiff was complaining of vaginal pain and cramping.  R. 278.  Dr. Ashmore noted she was "healing well" but having vaginal/bladder/pelvic pain.  *Id.*  He noted marked bladder tenderness and a Bartholin's cyst on the left side.  *Id.*  He prescribed an antibiotic and Toradol (for pain).  *Id.*

It appears that Plaintiff did not return again to Dr. Ashmore until August 7, 2003, when she had her well-woman exam.  R. 276.  No complaints are noted and for current medications "see list."  *Id.*  Dr. Ashmore indicated Plaintiff should return in December, for a repeat colposcopy.  *Id.*

Plaintiff returned to Dr. Ashmore on November 5, 2003, with complaints of vaginal pain and pain on her lower left side.  R. 275.  She rated her pain as a 5 out of 10, and she had been taking Tylenol and Advil.  *Id.*  Dr. Ashmore asked that she return in four weeks.  *Id.*

On December 4, 2003, Plaintiff returned to Dr. Ashmore for a colposcopy with vinegar.  R. 274.  The doctor noted her history of VIN III and appears to have noted no problems.  *Id.*  Plaintiff was instructed to return in six months.  *Id.*

Plaintiff returned to Dr. Ashmore for her six-month follow-up on June 4, 2004.   R.
273.  For current medications, the note indicates no change.  *Id.*  Plaintiff was instructed
to return in six months.  *Id.*

Plaintiff returned to Dr. Ashmore as instructed, on December 3, 2004, for a
follow-up and repeat pap test.  R. 272.  Dr. Ashmore's notes appear to indicate no
evidence of problems.  *Id.*  Plaintiff was directed to return in a year.  *Id.*  The cytology
report from the test indicates, however, "low grade squamous intraepithelial lesion
(LSIL) encompassing: HPV/mild dysplasia/cin 1."  R. 306.  Plaintiff was informed of
these results on December 29, 2004, and also informed of the need to schedule an
appointment for a coloposcopy.  *Id.*

On January 6, 2005, Plaintiff returned to Dr. Ashmore for a vulva biopsy.  R. 271.
Dr. Ashmore performed the procedure and indicated she should return in two weeks.
*Id.*  On January 14, 2005, it appears Dr. Ashmore's office was working on a referral to a
doctor at Shands Hospital in Gainesville.  R. 270.  On January 27, 2005, Plaintiff called
and said she wanted to see Dr. Ashmore to give an update on her visit to Shands.  *Id.*

Plaintiff returned to Dr. Ashmore on January 31, 2005.  R. 269.  She had been
scheduled for a vulvar excision surgery on February 10, 2005, at Shands in Gainesville,
and had questions and concerns.  R. 268-69.   On February 17, 2005, Plaintiff returned
to Dr. Ashmore; she had the procedure as scheduled and was complaining of pain.
R. 268.  It appears he prescribed medication for a possible infection.  *Id.*  Plaintiff called
Dr. Ashmore's office on February 22, 2005, complaining of itching and white discharge;

the doctor's office called in a prescription and advised Plaintiff to call for an appointment if her condition did not improve.  *Id.*

Plaintiff returned to Dr. Ashmore on May 9, 2005, for a three-month follow-up. R. 267.  His notes indicate VIN III with "wide excision" an no tenderness or swelling and no lesion.  *Id.*  Plaintiff is instructed to return in three months.  *Id.*  Another note, dated May 15, 2005, states Plaintiff called and was having vaginal pain "still some healing from surgery"; it appears the doctor ordered a prescription or refill.  *Id.*

On June 8, 2005, Plaintiff returned to Dr. Ashmore with complaints of vaginal pain and swelling.  R. 266.  Plaintiff indicated she had pain since her February 2005 surgery; her pain was noted as a six.  *Id.*  Dr. Ashmore noted no lesion on vulva.  *Id.* On August 27, 2005, Plaintiff returned to Dr. Ashmore for a follow-up regarding her February 2005 vulvar wide excision.  R. 265.  Dr. Ashmore indicated she should return in four months.  *Id.*

On December 15, 2005, Plaintiff returned to Dr. Ashmore for a four-month recheck.  R. 264.  Dr. Ashmore indicated she should return in six months.  *Id.* On May 9, 2006, Plaintiff returned to Dr. Ashmore.  R. 262.  Her chief complaint was vaginal pain of two weeks' duration.  *Id.*; *see* R. 259.  Her medications were Lipitor, Celexa, Hydrochlorothiazide, and Detrol.  R. 261-62.  She also complained of abnormal vaginal discharge and pelvic and abdominal pain.  R. 259.  She reported her pain as a five and sharp.  *Id.*  No lesions were found on examination of her external genitalia.  *Id.*

Pap smears were done on her cervix and vulva.  R. 260.  She was prescribed

Vibramycin and directed to return for a follow-up in six months.  *Id.*

Plaintiff returned on May 25, 2006, and on June 2, 2006, for re-checks for vaginal

pain.  R. 258.  No other notes are indicated.  *Id.*

Plaintiff returned to Dr. Ashmore on June 29, 2006, complaining of vaginal pain.

R. 257.  The physician notes are not legible.  *Id.*

Plaintiff returned to Dr. Ashmore on July 27, 2006.  R. 256.  The office notes

indicate this was a follow-up visit for a Bartholin cyst excision "that has been slow to

heal requiring multiple antibiotics and sitz baths."  *Id.*  The excision was performed on

June 13, 2006, R. 210-11, 245; the pathology report indicates "[f]indings are compatible

with an inflamed Bartholin cyst" and "[n]o malignancy is identified," R. 212.  The July 27,

2006, office notes further indicate:

> She had been in a week or so ago and was feeling much, much better and
> had left on a p.r.n. basis.  She has returned now with 2 days of increasing
> pain and discomfort, not just with the Bartholin, but throughout the vulva.
>
> On exam, she has a cellulitis of the vulva as well as the soft tissue of the
> groin and upper buttocks.  She has a history in the past of severe
> hidradenitis with scarring.  The Bartholin incision is closing.  It is still a little
> swollen, but is not near as tender to touch to palpation and there is no
> masses underneath suggestive of abscess or other problems.

R. 256.  The doctor prescribed Levaquin and Dilaudid and directed Plaintiff to return in

one week.  *Id.*

The next record indicates Plaintiff returned to Dr. Ashmore on August 3, 2006, for follow-up for vulvitis and vulvar pain.  R. 255.  The notes indicate the pain has gotten worse and has not responded to the Levaquin.  *Id.*  The doctor noted "redness of the entire vulvar area."  *Id.*  Dr. Ashmore admitted Plaintiff to the hospital for IV antibiotics and IV pain medication.  *Id.*; *see* R. 214 (hospital admission notes: "Her lab work was unremarkable.  Over the course of her hospitalization, she slowly improved, and at the time of discharge, she felt better.").  Plaintiff was discharged from the hospital on August 8, 2006.  R. 214.

On August 21, 2006, Plaintiff returned to the doctor's office for follow-up and saw a different physician, Dr. David Dixon.  R. 253.  The notes indicate Plaintiff now has "vulvodynia of unknown etiology."  *Id.*  Plaintiff reported that she is doing "ok, but still has significant pain/burning."  *Id.*  On exam, no epithelial lesions were seen.  *Id.*  The doctor directed her to follow-up with Dr. Ashmore in two months.  R. 253-54.  He also referred her to pain management for the chronic vulvodynia which he suspected was "neuropathic from her multiple surgeries."  R. 254.  He prescribed Diluadid.  *Id.*  Plaintiff returned to Dr. Ashmore's office on August 30, 2006.  R. 252.  She reported that her pain was improving.  *Id.*  On exam, the doctor noted "marked improvement" and "[t]he cellulitis has resolved."  *Id.*  "There is some tenderness over the Bartholin incision but all in all, much improvement."  *Id.*  The doctor added Neurontin, Elavil, and gave Plaintiff some Lortab instead of Dilaudid.  *Id.*  He directed her to return in two weeks or as needed.  *Id.*

Plaintiff returned to Dr. Ashmore on December 7, 2006, for a follow-up and recheck of vulvar pain.  R. 250.  Plaintiff complained of increasing pain, now on the right side as well as the left.  R. 251.  The exam was "unremarkable."  *Id.*  The notes indicate Plaintiff "had been to pain management which did nothing more than increase her Elavil and Neurontin."  *Id.*  The doctor referred her to Gainesville for a second opinion regarding the chronic vulvar pain.  *Id.*

Plaintiff returned to Dr. Ashmore on January 12, 2007, complaining of pelvic pain on the right side of three days' duration.  R. 247, 248.  She rated her pain as a seven and described it as "aching."  R. 248.  On exam, the doctor noted "redness and swelling" on the labia majora, but no lesion or mass.  R. 249.  He prescribed Cipro and sitz baths and directed her to return as needed.  *Id.*

On January 31, 2007, Plaintiff saw Dr. Ashmore for a "disability consultation."   R. 245.  In response to a question asking if the patient is in pain, the answer is "no."  *Id.*  Under "past medical history," the notes indicate: "Reviewed history from 05/09/2006 and no changes required."  *Id.*  "Patient indicates history of Other Cancer, Depression, Hypertension, Thyroid Disease, Weight Disorder, Anesthetic Complications."  *Id.*  Under "past surgical history," the notes indicate: "Reviewed history from 07/14/2006 and no changes required."  *Id.*  "Tonsillectomy, Other Surgery, CO2 LASER OF VULVA 2003 (REA), VULVECTOMY 2005 SHANDS, Bartholin cyst excision 06/13/06."  *Id.*  The notes further indicate:

> She has had chronic hydradenitis throughout her life.  She has had two surgeries for VIN-2, laser procedures.  She had excision of a Bartholin's

abscess on the left. She has had chronic vulvar pain for a long time throughout her life, and after her first surgery, the pain increased and it has been difficult for her to work ever since. The two following surgeries just added insult to injury to where she is nearly incapacitated from her vulvodynia. We discussed the difficulty of the problem and present management and the long-term plan and care and seems to have a feel for it and understanding of it and is in agreement, so we will continue to push forward in hopes that over time we can improve this problem.

R. 244. Plaintiff is directed to follow-up as needed; no other notes are included. R. 244-46.

### 2. Dr. Ashmore's Questionnaire

In February 2007, as found by the ALJ, Dr. Ashmore completed a two-page check-list titled Residual Functional Capacity (RFC) Questionnaire. R. 431-32. On this questionnaire, the doctor indicated Plaintiff could stand or walk one hour per normal work day; could not sit or lift anything during a normal work day; could use her hands for simple grasping, pushing and pulling, and fine manipulation; could not use her feet for repetitive movements as in operating foot controls; is able to bend frequently and reach above shoulder level; and cannot squat, crawl, or climb. R. 431. He checked "no" in response to the questions "Can the claimant sustain activity at a pace and with the attention to task as would be required in the competitive work place?" and "Can the claimant be expected to attend any employment on an eight (8) hour/5 days a week basis?" *Id.* at 431-32. In response to the question "Does the claimant have a non-exertional impairment which has a neurological, psychological, allergenic, respiratory, or environmental restriction associated with it or in which pain, fatigue or intelligence substantially restrict the claimant's ability to function?," the doctor checked "yes" and

circled the words "neurological" and "pain."  *Id.* at 432.  In response to the question "Is it

in your medical opinion that the claimant was disabled before 12/31/01?," the doctor

wrote, "yes 12/18/01."  *Id.*  In the section titled "REMARKS (on above or other functional

limitations to be considered in claimant's employment)," the doctor wrote, "unable to

stand or sit due to chronic vulvar pain and chronic vulvar edema."  *Id.*  At the bottom of

the page, filling in blanks in the line stating "PERIOD OF ABOVE STATED

LIMITATIONS," the doctor wrote "12/18/01" to "present."  *Id.*  The form is signed by

Dr. Ashmore and dated February 14, 2007.  *Id.*

### 3.  ALJ's Rejection of Dr. Ashmore's Opinion

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  *See, e.g.*,

Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d

580, 583 (11th Cir. 1991).  This is so because treating physicians "are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations."  20

C.F.R. § 404.1527(d)(2).  The reasons for giving little weight to the opinion of the

treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957

F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated, Phillips, 357 F.3d at

1241.  "The [Commissioner] must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Good cause for discounting the treating physician's report may be found "when it is not accompanied by objective medical evidence or is wholly conclusory."   Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).   Good cause also may be found when the physician's opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440.

In this case, the ALJ determined that a review of the medical records kept by Dr. Ashmore and his office during the relevant time period, beginning in November 2001, fail to document symptoms that support Dr. Ashmore's statements provided in the two-page RFC Questionnaire.  *See* R. 22.  This determination is supported by the record, summarized above, as no contemporaneous medical notes indicate any restrictions or limitations imposed on Plaintiff, particularly in November and December 2001 or for a twelve-month period thereafter.  Although many medical records are included for the time period following 2002, none of those records indicate any restrictions or limitations related to Plaintiff's treatment in December 2001.  Good cause

thus exists for the ALJ's decision to discount Dr. Ashmore's opinions stated in the two-page RFC Questionnaire.  *See, e.g.*, <u>Lewis</u>, 125 F.3d at 1440; <u>Edwards</u>, 937 F. 2d at 583; *see also* <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991) ("Crucial to Thomas' argument is the ALJ's failure to accord deference to Dr. Joseph's report finding Thomas 'totally disabled.'  Thomas correctly points out that a treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified.  When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion.  Dr. Joseph's report is not a 'comprehensive study' as alleged by Thomas, but rather consists of a two page form provided by an insurance company.  It contains few explanations and is composed almost entirely of conclusions.  Under these circumstances, the ALJ was not obliged to accord Dr. Joseph's opinion greater weight than the opinions of the other doctors in this case." (citations omitted)).

## C.  No Severe Impairment

In her final issue, Plaintiff argues the ALJ erred in finding she did not have a severe impairment and in finding her allegations of disability not credible.  Doc. 14 at 1, 6-10.  Plaintiff had to establish she was disabled prior to the expiration of her insured status on December 31, 2001.  *See* 20 C.F.R. § 404.131; <u>Wilson</u>, 284 F.3d at 1226.  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Both the "inability" and the "impairment" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).

A fair reading of Plaintiff's medical records, summarized above, indicates her treatment for VIN-III in December 2001 was successful and she was not disabled as of December 31, 2001, or for twelve months thereafter.  See, e.g., Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."); Fessler v. Apfel, 11 F. Supp. 2d 1244, 1253 (D. Colo. 1998) ("'If an impairment can reasonably be treated or controlled it cannot constitute a disability.'" (quoting Limon v. Shalala, 884 F.Supp. 1481, 1487 (D. Colo. 1995)).  See also, e.g., McQuestion v. Astrue, 629 F. Supp. 2d 887, 901-02 (E.D. Wis. 2009) ("Because the ALJ adjudicated plaintiff's application several years after his alleged onset and the date last insured, . . . [h]e could determine duration based on the historical evidence.  However, he could not require plaintiff to meet the durational requirement prior to the date last insured.  In order to prevail at step three, plaintiff had to show (1) that he met a Listing on or before the date last insured, and (2) that he met the Listing for at least twelve months.  Plaintiff could establish the second element by showing that disability based on the impairment was expected to or in fact did continue after the date last insured, for a total period of twelve months or more.").  Although Plaintiff had several follow-up appointments in the first half of 2002, she returned to Dr.

Ashmore only three times in 2003, in August, November, and December.  In 2004, she

returned only twice for routine six-month follow-up appointments, in June and

December.  Her VIN-III evidently recurred and she underwent a second excision

surgery in February 2005.[*]  Nothing in the medical records indicates Plaintiff was

disabled following the excision in December 2001 or for a continuous twelve-month

period thereafter, as required by the Social Security regulations' definition of "disability."

In February 2007, Dr. Ashmore opined that Plaintiff was disabled from December 18,

2001, to the present; however, because the limitations he ascribed to Plaintiff were not

supported by his medical records, and      Dr. Ashmore did not explain his conclusory

statements, the ALJ could properly discount that opinion, as explained above.

To the extent Plaintiff asserts the ALJ erred in rejecting her testimony about her

pain and limitations, the record supports the ALJ's determination.  The credibility of the

Plaintiff's testimony must also be considered in determining if the underlying medical

---

[*]The documentation Plaintiff has provided with her memorandum – a copy of a chapter titled "Gynecologic Cancers" from an unidentified text – indicates VIN "is a precancerous condition of the vulva" and "refers to abnormalities in the cells on the surface of the vulvar skin, called epithelial cells."  Doc. 14 Attach. p. 4.  "There are three categories (grades) of VIN," with the lowest as VIN I and the highest as VIN III: "High-grade VIN (VIN 3) is also classified as carcinoma *in situ* of the vulva, or stage 0 vulva cancer."  *Id.*  The text further explains that treatment includes surgical excision, as was done for Plaintiff.  *Id.*  The text also explains that, with stage 0, "[t]he cancer is confined to the surface of the vulvar skin" and is "squamous cell cancer of the vulva also known as vulvar carcinoma or *in situ*."  *Id.* at 9.  The text explains that during the first two years after initial treatment, a patient will probably have check-ups every three to four months and that the first two years "are the time when risk of cancer recurrence is highest."  *Id.* at 13-14.  The text also notes that for women who smoke (as Plaintiff does), "smoking further increases the risk of vulvar cancer or a VIN recurrence."  *Id.* at 5.

condition is of a severity which can reasonably be expected to produce the alleged pain.

Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R § 404.1529 (explaining how symptoms and

pain are evaluated); 20 C.F.R. § 1545(e) (regarding RFC, total limiting effects).  This is

guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony

because it is the medical model, a template for a treating physician's evaluation of the

patient's experience of pain.  After considering a claimant's complaints of pain, an ALJ

may reject them as not credible.  *See* Marbury, 957 F.2d at 839 (citing Wilson v.

Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain

testimony where such testimony is critical, the ALJ must articulate specific reasons for

questioning the claimant's credibility.  *See* Wilson, 284 F.3d 1225.  Failure to articulate

the reasons for discrediting subjective testimony requires as a matter of law, that the

testimony be accepted as true.  *Id.*

> In this case, the ALJ made the following findings concerning Plaintiff's testimony:

> At the hearing the claimant offered the following relevant testimony.  She
> reported that she first started experiencing severe vulvular discomfort in
> September of 2001.  The claimant stated that she used creams and
> antibiotics, but that these were ineffective.  She testified that the pain had
> been so severe that she had been bedridden.  She was diagnosed with
> cancer by Dr. Ashmore in November of 2001 and underwent surgical
> removal of the cancerous tissue in December of 2001.  Following the

surgery the claimant alleged that she had had difficult walking which
continued to the present, and that she had experienced frequent infections
due to poor healing of the surgical site, which were caused by walking.

In regards to her specific functional abilities during the relevant time
period, she testified that she could only sit for half an hour to forty five
minutes, and that she could only walk for a half hour.  The claimant
reported that lifting had also been a problem due to her pain, and that she
had had difficulty even lifting a gallon of milk.  She reported that during the
time under consideration she had been unable to cook, vacuum, make the
bed, or do her laundry.  The claimant explained that during the time period
to be considered she had to lay down twenty hours out of the day.  When
asked to rate her pain in December of 2001, the claimant reported that
she was experiencing pain that was eight on the standard ten point pain
scale.  She explained that her pain level had started at a five in September
of 2001, and had climbed to an eight by the time she had surgery and that
the pain had persisted past this time.

After considering the evidence of record, the undersigned finds that the
claimant's medically determinable impairment has not been demonstrated
to cause more than minimal limitation for a period of at least twelve
months, as required by the regulations of the Social Security
Administration.  There is simply insufficient evidence to support the level
of limitation alleged by the claimant.

R. 21.  Again, a review of the contemporaneous medical records does not reflect the

level of pain and limitations testified to by Plaintiff.  When Plaintiff returned to              Dr.

Ashmore for a post-operative checks in January 2002, the doctor did prescribe a pain

medication (Toradol); however, nothing indicates Plaintiff took this medication on a

continuous basis for a twelve-month period.  *See* R. 285.  Similarly, although the

medical records note that Plaintiff complained of vulvar bleeding and swelling after

walking in January 2002,  Dr. Ashmore also noted Plaintiff was healing well.  *See*

R. 283-84.  After January 2002, Plaintiff did not return to Dr. Ashmore until May 2002; at

this time, her medications included Vioxx.  R. 282.  Plaintiff returned to Dr. Ashmore in

July 2002 for a well-woman examination; nothing indicates Plaintiff was taking pain medication or had any restrictions or limitations at this point.  *See* R. 280.  Plaintiff did not return to Dr. Ashmore again until December 2002 and appears to have experienced temporary problems following the colposcopy performed then as part of the VIN-III recheck.  R. 277-79.  After December 2003, however, Plaintiff did not return to          Dr. Ashmore again until August 2003, for a well-woman exam.  R. 276.

Substantial record evidence thus supports the ALJ's determination that "[t]here is simply insufficient evidence to support the level of limitation alleged by the claimant." R. 21.  *See, e.g.*, Fessler, 11 F. Supp. 2d at 1250 ("[W]hen the medical evidence fails to corroborate the severity of the pain alleged, the weight given the subjective evidence may be affected.").  The objective medical record evidence does not indicate long-term pain, limitations, or restrictions for Plaintiff as of December 2001.  *See id.* at 1253 ("While the record as a whole indicates Fessler suffered from periodic attacks of severe back pain, it does not show her medical condition lasted or could be expected to last continuously at least 12 months as required for a finding of disability.").  Therefore, the ALJ did not err in concluding Plaintiff did not have a severe impairment and, as a result, denying her application at step two.  *See, e.g.*, Phillips, 357 F.3d at 1237 (explaining that, at step two, ALJ considers medical severity of impairment(s) and determines whether impairment(s) significantly limit claimant's physical or mental ability to do basic work skills; if impairments are medically severe, then ALJ moves on to step three).

## VI.  Conclusion

Considering the record as a whole, substantial evidence supports the findings of the ALJ and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is directed to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on June 27, 2012.


**s/  Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**